**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MATHIEU ZAHUI,<br><br>                Defendant. | Case No.: 1:26-cr-00016-JEB |

**DEFENDANT MATHIEU ZAHUI'S MEMORANDUM IN AID OF SENTENCING**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 1

I.    PROCEDURAL BACKGROUND ......................................................................... 1

II.   OFFENSE CONDUCT .......................................................................................... 2

LEGAL ARGUMENT .................................................................................................... 3

I.    THE APPROPRIATE TOTAL OFFENSE LEVEL IS 14 BECAUSE THE
      OBSTRUCTION ENHANCEMENT IS INAPPLICABLE HERE ......................... 3

      A.    Several of Mr. Zahui's alleged misstatements are immaterial and too vague to be
            false or obstructive............................................................................................ 4

      B.    Mr. Zahui's alleged unsworn misstatements did not significantly impede or
            obstruct the government's investigation. ........................................................... 6

II.   A BELOW-GUIDELINES SENTENCE IS SUFFICIENT BUT NOT GREATER
      THAN NECESSARY .......................................................................................... 10

      A.    Mr. Zahui's History and Personal Characteristics ........................................... 11

            1.    Mr. Zahui suffered poverty and illness in his early life................................ 12

            2.    Mr. Zahui dedicated his young-adult life to education and self-improvement.............. 13

            3.    Mr. Zahui honorably served as a U.S. Marine for eight years and as a public
                  servant for over twenty years. ...................................................................... 14

            4.    Mr. Zahui is a devoted husband and an active father. .................................. 16

            5.    Mr. Zahui has a strong faith and is committed to serving others................... 19

      B.    Nature of the Offense ...................................................................................... 21

            1.    Mr. Zahui responsibly managed ADF's finances for fifteen years................ 22

            2.    ADF operations are disrupted by the COVID-19 shutdown........................... 22

            3.    Mr. Zahui rationalizes his conduct based on his upbringing and family needs............. 26

      C.    The § 3553(a) Factors Support a Significant Variance and a Sentence of Home
            Confinement. .................................................................................................... 28

1.   A term of imprisonment is not warranted based upon Mr. Zahui's life, character, and participation in the instant offense. ........................................ 29

2.   A sentence of home detention reflects the seriousness of Mr. Zahui's offense, promotes respect for the law, and acheives the punishment and deterence goals of sentencing. ...................................................................................... 31

   (a)   Mr. Zahui has no criminal history, has accepted responsibility, and poses no risk of re-offense. ............................................................................. 31

   (b)   Mr. Zahui and his family have suffered substantially due to the criminal investigation and his pleading guilty. ...................................................... 31

   (c)   A sentence of home detention achieves the punishment and deterrence goals of sentencing. .................................................................................... 33

3.   A sentence of probation with alternatives is consistent with prior gratuity sentences. ............................................................................................... 33

4.   A downward variance permits a sentence without a term of imprisonment ................. 35

D.   The Government Does Not Seek Restitution in This Case. .............................................. 36

E.   Forfeiture Should Be Limited to the Amount Mr. Zahui Personally Obtained as a Result of the Offense Charged. .......................................................................... 37

F.   A Sentence Without a Fine Is Appropriate in This Case. .................................................. 38

III.   CONCLUSION .................................................................................................... 39

**INTRODUCTION**

Mathieu Zahui is a 59-year-old career public servant whose life has been one of perseverance, in pursuit of improving the lives of others. The instant case is his first and only conviction.  Mr. Zahui accepts responsibility and is remorseful for his conduct that brought him here.  He humbly asks the Court to see his wrongdoing for what it is—an aberration from a hard-working, ethical, life of service. As a testament to his strong familial and community contacts and the positive contributions Mr. Zahui makes in this country, fifteen individuals have submitted letters of support, which are included as exhibits to this submission.

To be clear, Mr. Zahui committed serious crimes here, and punishment is warranted for his actions. As explained in greater detail below, requiring Mr. Zahui to serve twelve months of home confinement is an appropriate sentence in this case. Such a sentence would allow him to care for his family, including his young twins, while also having greater ability to pursue new employment in order to ease his family's financial hardships as a result of this case and his resignation from federal government service. A term of imprisonment would not aid in Mr. Zahui's re-entry to society after service of a sentence, and a term of home confinement would serve as a meaningful and sufficient punishment, particularly when coupled with the collateral consequences Mr. Zahui is already facing.

**BACKGROUND**

**I.       PROCEDURAL BACKGROUND**

On February 23, 2026, Mr. Zahui pleaded guilty to two counts charged by Information: Count One of receiving a gratuity as a public official, in violation of 18 U.S.C. § 201(c)(1)(B) and Count Two of making false statements to federal law enforcement, in violation of 18 U.S.C. § 1001. Since pleading guilty, Mr. Zahui has been subject to pretrial supervision and has remained in compliance with his conditions of release. Sentencing is set for May 27, 2026 at 10 a.m.

The Presentence Investigation Report ("PSR") supports a Criminal History Category of I (with zero criminal history points) and calculates a total offense level of 14, which corresponds to a Guideline range of 15 to 21 months of imprisonment. *See* ECF No. 15 at ¶ 104 ("PSR").

## II.   OFFENSE CONDUCT

Until recently, Mr. Zahui served in an executive role within the U.S. African Development Foundation ("ADF"), an independent agency established by Congress in 1980 to support African-owned and African-led business enterprises. *See* PSR ¶¶ 9-10. From late 2019 until late 2023, Mr. Zahui was involved in the award and approval of payment of invoices of sole-source contracts to Company-1, a Kenyan company that was to provide "logistical support" for ADF events. *Id.* ¶¶ 14-15. An individual contact of Mr. Zahui's since 1999, CC-1, was an owner in Company-1. *Id.* ¶ 13. During the course of Company-1's contractual relationship with ADF, Mr. Zahui received $12,000 in cash payments from CC-1. *Id.* ¶ 20.

Mr. Zahui was interviewed twice by special agents of the Office of Inspector General for USAID ("OIG"), which also has oversight of ADF. *Id.* ¶ 22. During an interview on January 11, 2024, the OIG agents asked a series of questions regarding Mr. Zahui's relationship with CC-1, and Mr. Zahui gave a false response that he never received any benefits from CC-1. *Id.*

In the Statement of Offense, Mr. Zahui also acknowledged and accepted responsibility for the improper handling of certain invoices of third parties that were paid through Company-1's contracts. *See* ECF No. 10 at ¶¶ 9-10 ("Statement of Offense"). That related conduct, upon which the government focuses, is discussed in more detail in Section II.B below.

## **LEGAL ARGUMENT**

I.    **THE APPROPRIATE TOTAL OFFENSE LEVEL IS 14 BECAUSE THE OBSTRUCTION ENHANCEMENT IS INAPPLICABLE HERE**

Contrary to the assessment in the PSR, the government seeks a two-point enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1 based upon alleged "repeated" or "continuous" lies during two interviews with OIG agents. *See* ECF No. 14 at n.1; *id.* at 12 ("Gov't Memo"). The obstruction enhancement, however, is not applicable to Mr. Zahui's conduct because the alleged misstatements upon which the government relies, which were not under oath, did not significantly obstruct or impede the government's investigation or prosecution.

A two-point enhancement for obstruction is proper when:

(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and;

(2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

U.S.S.G. § 3C1.1. On its face, § 3C1.1 appears broad, but the Application Notes clarify that not all false statements to law enforcement justify the enhancement. *See United States v. Mendoza-Gomez*, 69 F.4th 273, 277 (5th Cir. 2023) ("[A] § 3C1.1 enhancement typically involves 'egregiously wrongful behavior whose execution requires a significant amount of planning and presents an inherently high risk that justice will in fact be obstructed'").

The Application Notes provide non-exhaustive lists of conduct the enhancement does and does not cover. According to the Guidelines, "[m]aking false statements, not under oath, to law enforcement officers" is ordinarily not sufficient to trigger application of the adjustment unless the information provided was both "materially false" and it "significantly obstructed or impeded the official investigation of the instant offense." U.S.S.G. § 3C1.1 cmt. n.4(G), 5(C). Information that

3

is "material" is information that, "if believed, would tend to influence or affect the issue under determination." *Id.* § 3C1.1 cmt. n.6.

Mr. Zahui voluntarily agreed to be interviewed by OIG agents on January 11, 2024 and February 1, 2024. Because Mr. Zahui's alleged misstatements were not made *under oath* to a law enforcement officer, the obstruction enhancement only applies if Mr. Zahui's statements were material and significantly impeded the government's investigation or prosecution. They did not.

The lone adverse impact upon the investigation that the government offers to support application of this enhancement is that "the truth was only uncovered after an extensive investigation into the defendants phone, emails, and ADF records." *See* Gov't Memo at 12. It is hard to imagine how any investigation of the conduct that is the basis for this case would not have involved review of such foundational records, regardless of what answers Mr. Zahui provided. *See United States v. Ahmed*, 324 F.3d 368, 373 (5th Cir. 2003) (declining to apply obstruction enhancement because "there [was] absolutely no evidence that [defendant's] statements caused the FBI agents to go on a 'wild goose chase,' or in any other way misled the agents" when "the FBI had to go forward with their investigation as they normally would, i.e. continue searching for and tracking down possible leads as to the [suspects'] whereabouts").

A.    **Several of Mr. Zahui's alleged misstatements are immaterial and too vague to be false or obstructive.**

Several of the statements upon which the government relies are either immaterial or too vague to form the basis for an obstruction of justice enhancement. These include Mr. Zahui (1) misremembering how often he communicated with CC-1; (2) denying having a relationship with CC-1 where CC-1 "would do things for [Mr. Zahui] without them being true"; and (3) denying that he "direct[ed] CC-1 to make payments to U.S. based [ADF] employees." *See* Gov't Memo at

4

8-10. None of these three statements were a basis for Mr. Zahui's guilty plea to Count Two.[1] Given the vagueness and phrasing of several of these questions, Mr. Zahui contests whether his responses were willfully false.[2] Regardless, his answers were not material and, therefore, could not have substantially obstructed or impeded the government's investigation.

All statements are immaterial because the government has failed to show how they affect an issue related to the offense of conviction. Mr. Zahui's statement about how often he spoke to CC-1 before the contract was in place was in response to a broadly worded open-ended question too vague to elicit a false answer, let alone a material one. The agent asked Mr. Zahui, without specifying a particular timeframe, "how frequently did you communicate" with CC-1? *See* Gov't Memo at 8. Mr. Zahui answered that he was "not good at [] maintaining [] communication with friends" and that prior to the contract—which could have been understood to include the bidding process—he talked to CC-1 "two or three times in a year." *Id.* Because Mr. Zahui met CC-1 in 1999 (*see* PSR ¶ 13), the agent's question applied as equally to the month before the contract was signed as it did to a random month twenty years earlier.

The same issues plague the second statement, in which Mr. Zahui denied "hav[ing] a relationship where [CC-1] would do things for [Mr. Zahui] without them being true." *See* Gov't Memo at 10. It is easy to see how Mr. Zahui would be confused by such an oddly worded and

---

[1] The government also cites the false statement that is the basis for Count Two as a basis for the obstruction enhancement. On January 11, 2024, Mr. Zahui denied receiving benefits from CC-1. As to the application of the obstruction enhancement, however, "a defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury)…is not a basis for application of this provision." § 3C1.1 cmt. n.2. For an offense of receipt of a gratuity, a thing of value must be exchanged. *See* 18 U.S.C. § 201(b)(2). Therefore, Mr. Zahui's denial of receiving benefits is a denial of guilt that cannot form the basis of an obstruction enhancement. *Id.*; *see Ahmed*, 324 F.3d at 374 (finding § 3C1.1 did not apply to defendant who pled guilty to harboring an illegal alien because his misstatement to FBI that he did not know the illegal alien was effectively a denial of guilt).

[2] As stated previously, § 3C1.1 cmt. n.2 cautions courts that inaccurate statements resulting from confusion, mistake, or faulty memory may not reflect a willful attempt to obstruct justice. The agents questioned Mr. Zahui about events that occurred three to four years in the past, so it is probable that Mr. Zahui misremembered certain details.

vague question—what "things" is the agent referring to and how are they not true? Whether Mr. Zahui was confused or not, his response cannot be material to the government's investigation when it is unclear what "things" the agent was asking about and if they relate to the offense of conviction.

The government also relies on Mr. Zahui's denial of "direct[ing] CC-1 to make payments to U.S. based employees" as further grounds for the obstruction enhancement. *See* Gov't Memo at 9. Mr. Zahui contests that his response was false, and the government's interpretation of his response appears to overlook the important and critical distinction between a "contractor" and an "employee" in the public sector. Mr. Zahui acknowledges that some of the payments issued by Company-1 related to work completed by U.S.-based ADF contractors—not ADF employees. The government has offered no evidence that Company-1 made payments to ADF employees, either in its filing or to defense counsel during plea negotiations.

These questions are overly broad, vague, and confusing; therefore, Mr. Zahui's responses are equally vague. That, plus the lack of context or explanation by the government, make the responses immaterial.

### B.    Mr. Zahui's alleged unsworn misstatements did not significantly impede or obstruct the government's investigation.

None of the alleged misstatements identified by the government, singularly or cumulatively, could possibly have impeded the government's investigation. The government's passing reference to the agents having to review standard foundational records does not equate to obstruction or impeding the investigation. *See* Gov't Memo at 9-10, 12. What is more, contrary to what the government argues in its sentencing submission, the OIG agents stated during the interviews that that they already knew the answers to questions they were asking, based upon other interviews and records. The government asserts the agents learned Mr. Zahui's answers were false after Mr. Zahui's interview (*see* Gov't Memo at 9-10, 12), but that claim is belied by the agents'

6

own statements during Mr. Zahui's interviews, in which they said "some questions that we're asking, we already know the answers to." Even if the agents' statements were bluster and an interview tactic, the government does not bother to allege that Mr. Zahui's alleged misstatements "significantly impeded" its investigation. Its failure to do so is dispositive.

This court undertook a lengthy analysis of whether a defendant's false statements to law enforcement officers "significantly obstructed or impeded the official investigation" in *United States v. Olson*. No. 22-CR-144-GMH, 2023 WL 4951739, at *6 (D.D.C. Aug. 3, 2023). The PSR applied a two-level enhancement for obstruction of justice on each count of conviction, alleging that, during two separate interviews with the FBI, the defendant concealed information regarding his relationship with Person 1 and the benefits he received from that person. *Id.* The court declined to apply the obstruction enhancement based on this theory (but did apply it on an unrelated theory) because the prosecution failed to show that any of the misstatements "significantly obstructed or impeded the official investigation of the instant offense." *Id.* at *9.

First, the court reasoned that "it may be difficult to show that a factual misstatement significantly obstructed or impede[d] an investigation when, at the time the falsehood was uttered, law enforcement already knew the truth." *Id.* at *10; *see also United States v. Yaniro*, 303 F. App'x 100, 103 (3d Cir. 2008) (declining to apply an obstruction of justice enhancement where "[the defendant's] false statements [to investigators] were largely irrelevant to the investigation and the prosecution because they were quickly refuted by evidence already in the government's possession"); *United States v. Surasky*, 976 F.2d 242, 247 (5th Cir. 1992) (finding that a statement by an inmate that he was not involved in an escape attempt did not significantly impede the investigation of that attempt where investigators had other evidence of his guilt). The evidence in

7

*Olson* showed that, as to at least some of the statements upon which the government was relying, the FBI likely already knew the answers when they asked the defendant the questions.

Second, the court determined that it was not enough for the prosecution to say that it "believe[d] the false statements on these points were material to the government's investigation and impeded it." *Olson*, 2023 WL 4951739 at \*10. To establish that an investigation was "significantly obstructed or impeded," the government must show "a causal relationship between the materially false statement given and a resulting impediment upon the instant investigation or prosecution." *Id.* (*citing United States v. Griffin*, 310 F.3d 1017, 1023 (7th Cir. 2002)). Indeed, "[w]ithout evidence that the official investigation was [significantly] impeded, even a material misstatement cannot support the obstruction enhancement." *Id.* (internal citations omitted). Rather, the court held that "[t]he government must prove 'a detrimental effect upon [its] efforts to investigate or prosecute the instant offense.'" *Id. (citing United States v. Selvie*, 684 F.3d 679, 684 (7th Cir. 2012)); *see also United States v. Banks*, 347 F.3d 1266, 1271 (11th Cir. 2003) ("To show that [a defendant's] conduct actually resulted in a hindrance, the government must demonstrate how it fruitlessly spent investigation or prosecution resources due to [their] untruthfulness"); *see also United States v. Adejumo*, 772 F.3d 513, 529 (8th Cir. 2014) (finding application of an obstruction of justice adjustment to be "clear error" where "[t]he government chose not to offer any evidence on th[e] issue at sentencing" and rejecting the argument that a court may rely on the representation of a prosecuting attorney that the defendant's false statements to investigators impeded the investigation because a "prosecutor's statement to the court [is] not evidence").

The facts of Mr. Zahui's case are strikingly similar to the facts in *Olson*. The government relies on alleged misstatements that Mr. Zahui made to OIG agents during his interviews on January 11, 2024 and February 1, 2024. The government references one such statement from

8

January 11, in which Mr. Zahui "knowingly and willfully gave a false response that he had never received any benefits from CC-1." *See* Statement of Offense ¶ 14; Gov't Memo at 10.

During the same interview, the agent revealed that—like the agents in *Olson*—she and her fellow agent already knew the answers to some of the questions they asked Mr. Zahui and that some of his answers conflicted with information they learned during the investigation. For instance, during Mr. Zahui's January 11 interview, one of the agents told Mr. Zahui they had "learned a lot of different information . . . in the course of [the agents' other] interviews" with ADF personnel:

```
▆▆▆▆▆▆▆: In the course of these investigations— I'm
         sorry. In the course of these interviews
         that we've been conducting. We've learned a
         lot of different information., right?
```

The agent further explained that in their role as factfinders, they also "comb through a number of different resources and documents," and that based on their interviews, some of the answers Mr. Zahui provided "are not what we've been told . . . from a number of people":

```
▆▆▆▆▆▆▆: So we're fact finders. That's our job. We
         don't make Recommendations to anyone. We get
         allegations. We comb through a number of
         different documents, resources. We talk to
         people, we corroborate or we don't
         corroborate the allegations that are put
         forth, right? So we're fact finders. So some
         of the things that we've just talked about,
         I gotta tell you, are not what we've been
         told.
ZAHUI:   Okay.
▆▆▆▆▆▆▆: And they've— they've been not what we've
         been told from a number of people.
```

The same agent said they were "asking some very direct questions and we're not getting answers" and that "some questions that we're asking, we already know the answers to":

> █████ : And so some of your answers are— are quite
> elusive, um, and broad. And we're asking
> some very direct questions, and we're not
> getting answers. And some questions that
> we're asking, we already know the answers
> to.

These statements call into question the government's suggestion that the agents only discovered the truth after Mr. Zahui's interviews. Beyond minimizing his own knowledge and role, Mr. Zahui's answers did not misdirect the agents. As such, the government cannot show—nor does it even assert—that Mr. Zahui's purported misstatements in response to these questions impeded the government's investigation, let alone "significantly impeded" it. Further, the government has not provided any evidence of "a causal relationship between the materially false statement given and a resulting impediment upon the instant investigation or prosecution." *See Olson* at *6. For these reasons, the obstruction enhancement does not apply to Mr. Zahui's conduct.

## II.  A BELOW-GUIDELINES SENTENCE IS SUFFICIENT BUT NOT GREATER THAN NECESSARY

The advisory Sentencing Guidelines range is only one of several relevant factors in the Court's determination of a reasonable sentence. Sentencing courts must consider *each* of the factors enumerated in 18 U.S.C. § 3553(a) in fashioning an appropriate sentence:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed . . . .;

(3)    the kinds of sentences available;

(4)    [the applicable Sentencing Guidelines] . . . .;

(5)      any pertinent [Sentencing Guidelines] policy statement . . . .;

(6)      the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)      the need to provide restitution to any victims of the offense.

*See, e.g., United States v. Booker*, 543 U.S. 220, 268-69 (2005). Section 3553(a), "as modified by *Booker*, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *see also United States v. Gardellini*, 545 F.3d 1089, 1092 (D.C. Cir. 2008) (noting that "the Supreme Court has emphasized the discretion of district courts to sentence within or outside the Guidelines"); *United States v. Ausburn*, 502 F.3d 313, 327 (3d Cir. 2007) (noting that the sentencing court, in the post-*Booker* era, has the "discretion to craft an appropriate sentence falling anywhere within the range of punishments authorized by Congress").

Sentencing under § 3553(a), therefore, requires the Court to start with the *minimum* sentence permissible and add only so much additional punishment, if any, as is necessary to vindicate § 3553(a)'s purposes. As discussed below, removing Mathieu Zahui—a 59-year-old with zero criminal history points—from his community and family into an overcrowded prison does not accord with the principles of § 3553(a), particularly in light of the other options available to the Court.

## A.      Mr. Zahui's History and Personal Characteristics

Until the events leading to his plea, Mr. Zahui's life was the American dream personified. He was born in a poverty-stricken village of approximately 200 people in the Côte d'Ivoire (the Ivory Coast), where he grew up in a large family, sleeping on mats on the concrete floor of their two-room home. *See* PSR ¶ 55. His village had no electricity or running water, only one school, and many hungry mouths surviving on a diet of rice and bananas. *Id.* ¶¶ 55-57. From that

11

beginning, Mr. Zahui nonetheless steadfastly pursued an education, as instilled by his father, and made his way to the United States, where he served eight years as a soldier in the U.S. Marine Corps, earned two masters degrees, married a loving wife, fathered four children, and spent the past twenty-five years of his career in public service of his adopted country and the less fortunate in Africa. *Id.* ¶¶ 61-64, 85, 90.

Mr. Zahui has a quiet and thoughtful demeanor. His lifestyle is modest. When he is not working, he spends time with his family, worshipping at church, or volunteering with several civic organizations. If you were to look at Mr. Zahui's life under a microscope—as the Probation Officer did—you would see an honest, hardworking man from meager beginnings who is determined to improve the lives of those around him.

### 1.    Mr. Zahui suffered poverty and illness in his early life.

Mr. Zahui was born in 1966 in a small rural village with limited resources. *See* PSR ¶ 55. He is the second youngest of ten siblings. *Id.* ¶ 54. The youngest, his sister Odio Nina, whom Mr. Zahui adored, was diagnosed with polio as a young child, and was bound to a wheelchair until her passing in 2001. *Id.* Several of Mr. Zahui's older siblings died before he was born, some took their own paths to the United States, and others remain in the Ivory Coast. *Id.* ¶¶ 55, 59.

Mr. Zahui was a sickly child who suffered from frequent nosebleeds and a chronic skin condition that caused painful sores all over his body. *Id.* ¶ 58. Unfortunately, traditional African medicine was not equipped to diagnose or treat him effectively, and Mr. Zahui's family did not have the means to send him to the nearby city for modern medical treatment. *Id.* ¶¶ 58-59. Rudimentary treatments were attempted to alleviate his symptoms, but they offered little to no relief. *Id.* Mr. Zahui recalls one such failed treatment where his parents poured ice cold water over him in the middle of the night while a medicine man prayed over him. The treatment failed, as did

12

many other similar treatments. As a result, Mr. Zahui suffered as a child, both physically and emotionally.

Mr. Zahui's childhood was lonely because he was often sequestered from his brothers and sisters due to his illnesses. Exhibit 6 at 1 (Letter from Djedje-Kossu Zahui). After school, his siblings went to work in the fields or to play outside with their friends, but Mr. Zahui retreated home to spend time alone or with his mothers. *Id.* Because he was more vulnerable than his peers, his parents and siblings protected him and watched over him closely—which came with the cost of Mr. Zahui not having the interactions of a typical child in his community. *Id.* Despite concerns for his youngest son's life trajectory, Mr. Zahui's father had faith that Mr. Zahui would one day be healed. Now, when Mr. Zahui returns to his home village as an adult, the villagers see him as an example of hope and perseverance against the odds.

**2. Mr. Zahui dedicated his young-adult life to education and self-improvement.**

In 1987, when Mr. Zahui reached adulthood, some of his medical issues subsided, and he began pursuing university studies. *See* PSR ¶ 79. The extra time Mr. Zahui had spent at home meant he had more time to read, learn, and most importantly, receive his father's repeated charge to pursue education as the only path out of poverty. His father passed away in 1988 (*see* PSR ¶ 53), but Mr. Zahui kept his father's words at the forefront of his mind. After several shifts in college majors, including medicine and law, and attendance at universities in multiple countries, Mr. Zahui found his way to Goshen College in Goshen, Indiana, where he enrolled in general studies. *Id.* ¶¶ 79-80. There he met a United States Marine Corps recruiter who outlined a path to citizenship and higher education. *Id.* ¶ 85. Mr. Zahui seized that opportunity and spent the next eight years serving his adopted country. *Id.*

13

### 3.    Mr. Zahui honorably served as a U.S. Marine for eight years and as a public servant for over twenty years.

Joining the U.S. Marine Corps was one of the most meaningful decisions in Mr. Zahui's life. He learned discipline and dedication in a way like no other. His military service also allowed him the opportunity to become a U.S. Citizen and to fund his education. *See* PSR ¶¶ 64, 80-83. But it was not an easy path. Mr. Zahui's childhood illnesses prevented him from engaging in athletic activity, so the Marine Corps' rigorous physical requirements posed a significant obstacle to Mr. Zahui, especially because he had never learned how to swim. Despite these challenges, Mr. Zahui had the dedication and commitment required to complete basic training, even when he was the last recruit to pass the swimming test.

In under eight years, Mr. Zahui advanced from Private (E-1) to Staff Sergeant (E-6) while serving in logistics (S-4), in support of Operation Northern Watch and Operation Deny Flight. *See* PSR ¶ 86. When stationed at Cherry Point Marine Corps Air Station, he coordinated a complex deployment to Aviano, Italy, involving approximately 250 Marines and multiple airframes. *Id*. His performance evaluations recognized his independent judgment and multi-mission coordination under demanding conditions. The following table of commendations illustrates Mr. Zahui's many achievements over his military career:

| Commendation | Description |
|---|---|
| Navy & Marine Corps Achievement Medal with 1 star | Awarded for outstanding achievement or meritorious service beyond what is normally expected. The additional star indicates a second award, reflecting repeated recognition for strong performance and dedication. |
| Good Conduct Medal with 1 star | Awarded for three consecutive years of honorable and disciplined service without disciplinary infractions. The star indicates a second award, demonstrating sustained good conduct and adherence to Marine Corps standards over an extended period. |
| Sea Service Deployment Ribbon with 1 star | Awarded to Marines who complete overseas deployments at sea or with deployed units. The star indicates multiple deployments, reflecting operational experience and readiness. |

14

| National Defense Service Medal | Awarded for honorable active-duty service during a designated period of national emergency or conflict–Iraq. This recognizes service during a time when the nation required military readiness. |
|---|---|
| Armed Forces Service Medal | Awarded to service members who participated in significant U.S. military operations that involved no foreign armed opposition, such as peacekeeping or humanitarian missions. |
| NATO Medal | Awarded for participation in NATO-led operations, recognizing service in multinational missions supporting international security and stability. |
| Meritorious Unit Commendation | Awarded to units for exceptionally meritorious conduct and outstanding performance in the execution of difficult missions. This reflects that you were part of a unit recognized for excellence under demanding conditions. |
| Meritorious Mast (2nd award) | A formal recognition given by a commanding officer for outstanding individual performance, initiative, or leadership. Receiving this twice indicates consistent recognition for superior conduct and contribution. |
| Certificate of Commendation | Awarded for noteworthy performance or contributions that positively impacted mission success or unit effectiveness. |
| Navy & Marine Corps Commendation Medal | Awarded for sustained acts of heroism or meritorious service. This is a higher-level personal decoration recognizing significant responsibility, leadership, and performance over time. |

*Id.* ¶ 85. Mr. Zahui was honorably discharged in 2001. *Id.* While serving, he committed himself to this country and became a naturalized U.S. citizen in 1996. *Id.* ¶ 64.

Following his military service, Mr. Zahui taught economics at local community colleges in San Diego, California. *Id.* ¶ 92. There, he met and married his current wife, Vicky. *Id.* ¶ 61. In 2005, Mr. Zahui transitioned into federal civilian service at the Veterans Affairs ("VA") Medical Center in San Diego, where he served as a Budget Analyst. *Id.* ¶ 91. In 2010, he moved from San Diego to the Washington, D.C. metropolitan area to join the U.S. African Development Foundation ("ADF"), where he rose from Budget Analyst to Director of Financial Management over fifteen years. *Id.* ¶ 90. Throughout his career, and amidst ADF's current uncertainty, Mr. Zahui has stayed

15

committed to achieving ADF's mission in Africa. According to Mr. Zahui's former ADF supervisor, Bill Schuerch:

> In his early years at USADF, Mathieu was further recruited by the [VA] to join their headquarters staff in Washington D.C. However, he was dedicated to the purposes of USADF[.] He turned down the offered [VA] headquarters position to continue aiding USADF and African development.

Exhibit 3 at 3 (Letter from Bill Schuerch). ADF has been in turmoil since the change of administration and the President's directive via Executive Order 14217 to wind down the operations of ADF. The Board of Directors were fired and the chief executive fired. Mr. Zahui remained in his role and worked to stabilize an unpredictable situation for ADF staff and grant recipients in Africa. The remaining staff's access to office space and computer systems has been cut off in the past year but ordered restored in the course of litigation. Litigation regarding ADF's operations is ongoing.

Prior to his plea agreement hearing in February 2026, Mr. Zahui resigned from ADF in recognition of the wrongfulness of his conduct and in an effort for this case to not serve as a further distraction and impediment to ADF's continued operations. *See* PSR ¶ 90.

### 4. Mr. Zahui is a devoted husband and an active father.

Apart from being a fervent student and military veteran, Mr. Zahui is above all else a family man. He is devoted to his wife, Vicky, passionate about raising his children, active in his church, and driven to improving the lives of people both known and unknown, close to home and across the ocean.

Mr. Zahui met his wife in San Diego, California in 2001, and they were married in December 2002. *See* PSR ¶ 61. He is a father to four children, one of whom is from a prior relationship. *Id.* ¶ 61. His oldest daughter is thirty-one years old and lives in Dallas, Texas, where she is employed full-time as a Human Resources Analyst. *Id.* ¶ 62. The three youngest children

16

live in the family home in Virginia. *Id.* ¶ 61. His second oldest is twenty-two years old and attends George Mason University where she is pursuing a degree in Finance. *Id.* His ten-year-old twins are both active in their respective sports: competitive cheerleading and hockey, lacrosse, and football. *Id.* ¶ 66. Mr. Zahui and his wife spend most of their free time supporting their children's activities. *Id.* Nina Zahui recounts her father's active involvement in her life:

> As a father, my dad is caring, devoted, responsible, and genuinely one of the funniest people I know. He worked long hours for most of my life, and even though that meant he could not always be there for practices, he never missed what mattered most to me. I played basketball growing up and had tournaments nearly every weekend, and no matter how tired he was or how much he worked, he was always there—on the sidelines, supporting me.

Exhibit 11 at 1 (Letter from Nina Zahui).

Mr. Zahui's in-laws moved into the Zahui family home during the COVID-19 pandemic in 2020. *Id.* ¶ 65. Mr. Zahui's father-in-law, who recently passed away at the Zahuis' house while in hospice care, suffered from Alzheimer's, dementia, and colon cancer. *Id.* ¶¶ 65-67. When Mr. Zahui and his wife were not tending to their children, they spent time helping his mother-in-law care for her husband. *Id.* ¶¶ 65-66.

Mr. Zahui also remains closely connected to family in the United States and abroad, assisting older siblings and contributing to their well-being. Alana Zahui, his niece, describes his commitment to family in her letter to the Court:

> For years, my uncle opened his door to me and created a safe haven when I was going through some of the lowest parts of my life. He did this not only for me, but I have seen him create a safe haven for many other family members trying to navigate through life…I can wholeheartedly say he is the most family-oriented person in our entire family. It is his home where we gather for every major holiday. He is the glue that holds this family together.

Exhibit 2 at 1 (Letter from Alana Zahui).

17

Mr. Zahui's sister-in-law, Yui Hirano-Zahui, echoes the same sentiment:

> Above all, Mathieu is a devoted family man. He has always taken the initiative to keep our family connected, especially during important occasions such as Thanksgiving and other holidays. He is the one who reaches out, organizes gatherings, makes reservations, and ensures that we come together despite our busy lives. His efforts have strengthened family bonds in ways that are meaningful and lasting.

Exhibit 15 (Letter from Yui Hirano-Zahui).

Mr. Zahui's extended family considers him the glue that holds the family together. And rightfully so—Mr. Zahui financially supports his elder sister who lives in the Ivory Coast village where they grew up (*see* Exhibit 14 at 2 (Letter from Vicky Lumbwele-Zahui)), offers his home to extended family and friends whenever they need a place to stay (*see* Exhibit 2 at 1), and keeps his family connected by organizing family gatherings, handling logistics, and ensuring the family gets together despite their busy schedules. (*see* Exhibit 15). Mr. Zahui's wife, who has remained steadfast in her support during this time, attests to the resilience of her husband's care for his family, despite his own hardships:

> [Mathieu] always thinks first about family, both here and back home, before thinking about himself. Even now, while going through this difficult period and being unemployed, he still tries to help family members whenever he can.

Exhibit 14 at 2.

While Mr. Zahui is devoted and focused upon his family and others, he does so while still facing health challenges of his own. *See* PSR ¶¶ 70-75. The Department of Veteran's Affairs has classified him with a partial service-connected disability. *Id.* ¶ 71. For sleep apnea, Mr. Zahui utilizes a CPAP machine.[3] He has had a back surgery and carpal tunnel procedure but still suffers

---

[3] Based upon BOP Policy Statement 6031.05, it is unclear if Mr. Zahui would be permitted to continue his usage of a CPAP machine if sentenced to a term of imprisonment: "Local written procedures will address the management of specific equipment and devices that may raise local security concerns (continuous positive airway pressure [CPAP] machines, Transcutaneous electrical nerve stimulation [TENS] machines, etc)."

from pain that impacts his mobility. *Id*. He remains in discussion with his medical providers regarding potential further surgery as to his back and wrists to alleviate these ongoing issues. He also has a liver condition that requires multiple blood work tests and an ultrasound multiple times a year. *See* PSR ¶ 71 (listing medical conditions).

### 5. Mr. Zahui has a strong faith and is committed to serving others.

Mr. Zahui is an active member of his Catholic parish in Fairfax County, Virginia. *Id.* ¶ 68. He serves on the Knights of Columbus Parish Council as Outside Guard, and is one of eight members of the Evangelization, Faith and Formation Committee. *Id.* In 2025, he led the organization of the 141st Parish Annual Labor Day Picnic, a tradition of more than 140 years that is among the parish's largest community gatherings. *Id.* Mr. Zahui's commitment to his faith is evidenced in the way he has humbled himself, not only before this Court, but before his church community as well. According to Deacon Nicholas J. LaDuca Jr.:

> As an Ordained Deacon, I…have some experience in working with its members, both as a group and individually as to their spiritual journeys. I have found Mathieu to be both conscientious and committed to his faith… Mathieu has come to me to talk about the present situation he finds himself facing. His first concern is for his family. The consequences of his actions, for which he told me he takes full responsibility, weighs heavily on him because of the effect it will have on his family. During our conversation, not once did he refer to what may happen to him.

Exhibit 5 (Letter from Deacon Nicholas J. LaDuca Jr.).

In addition to his work at the church, Mr. Zahui has worked tirelessly as a community organizer in the U.S. and in Africa for the past fifteen years. *See* Exhibit 7 (Letter from Dr. Gustave D. Biaka). In 2011, shortly after civil war broke out in the Ivory Coast, Mr. Zahui helped form the Union Fraternelle des Ivoiriens D.C. Metro—a non-governmental organization ("NGO") devoted to organizing and reconciling differences between diaspora members in the U.S. *Id.* at 1.

Mr. Zahui's commitment to the African people extends beyond the contours of his job. From 2022 to 2024, Mr. Zahui worked relentlessly to reconcile a fifty-year disagreement between

19

the people of his childhood village, Ourepa, and the people of a neighboring village, Dahopa. *Id.* at 2. The two villages, which are located six miles from the city of Gagnoa, share a common tribe and history, but had been divided by conflict since Mr. Zahui was a young boy. *Id.* In 2022, Mr. Zahui connected with members from both villages to start an economic development association with the mission of merging the two villages into one. *Id.* After two years of work, Mr. Zahui was able to persuade the people of both villages that a single larger village had a better chance of receiving support from the national government to build a rural hospital, install running water, build more schools, and assign funding and aid from various NGOs. *Id.* Mr. Zahui was instrumental in achieving this meaningful merger of the two villages, which is now recognized as one village named Digbodia. *Id.*

Mr. Zahui now serves as the first Vice President of the Digbodia Community Development Association, which promotes the village's development and facilitates communication among the people, and plans a celebration of the new village every two years. *Id.* Mr. Zahui is so integral to this mission that, upon learning Mr. Zahui would not attend the celebration scheduled for this August, the village people intended to cancel the multi-day event. Mr. Zahui insisted the celebration go on without him, and continues to support planning efforts despite his planned absence.

Mr. Zahui also devotes himself to service in smaller ways, including events to support local causes, and often assists his elderly neighbors with tasks around their homes. *See* PSR ¶ 68. In addition, Mr. Zahui has served as a mentor to young military servicemembers and coworkers over the years. *See* Exhibit 1 (Letter from Afia Frempong). Afia Frempong, whom Mr. Zahui mentored during her time at ADF, recounts Mr. Zahui's care for herself and others:

> I first met Mathieu after graduating from Dartmouth College in 2012, when I began working at the United States African Development Foundation as a Research

Analyst. I was young, early in my career, and still learning how to navigate both professional life and life in Washington, D.C. I did not have family in the area, did not have a car, and lived far from many basic conveniences, including grocery stores. Mathieu quickly became more than a colleague. He became a guide, a mentor, and in many ways, a protective presence during an important season of my life. Mathieu and his family took it upon themselves to make sure I was cared for. On a bi-weekly basis, they would take me grocery shopping because they knew I did not have transportation and had no nearby family support. This was not something they were obligated to do. It was not something I asked of them. It was simply who they were, and who Mathieu was. He saw a need and responded with care.

*Id.* at 1.

Sandeep Sillwall describes ways Mr. Zahui cared for his colleagues:

I saw [Mathieu's] concern for people in both ordinary and serious workplace situations. On ordinary occasions, when someone was leaving the organization, Mathieu would often take the lead in recognizing that person and helping organize a going-away gathering. That may seem like a small thing, but it mattered to people when it happened. In a more serious situation, when a co-worker unexpectedly did not show up to work, Mathieu took the absence seriously and helped ensure that the appropriate authorities were contacted. We later learned that the employee had passed away from a heart attack…[and] what stayed with me was that the absence was not ignored, and that reflected the care I had seen from him in other settings as well.

Exhibit 13 at 1 (Letter from Sandeep Sillwall).

These are just two of the many examples of Mr. Zahui going out of his way to care for the people in his life, while expecting nothing in return.

## B.    Nature of the Offense

In addition to Mr. Zahui's personal history and characteristics, the Court must also consider "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). The Presentence Investigation Report details the nature of the instant offense, in alignment with the agreed Statement of Offense. *See* PSR ¶¶ 8-22. Accepting a gratuity and making a false statement to law enforcement are both serious offenses, and nothing in this memorandum is meant to suggest otherwise.

21

### 1.    Mr. Zahui responsibly managed ADF's finances for fifteen years.

ADF's mission is to provide grants to community groups and small organizations that benefit underserved and marginalized groups across Africa. *See* PSR ¶ 71. As a small independent agency, ADF had a modest annual appropriation of $30-45 million in the years leading up to 2025. Mr. Zahui began at ADF as a budget analyst, monitoring performance and compliance of particular grants. *See* PSR ¶ 90. Over the course of fifteen years, Mr. Zahui's portfolio spanned budget planning, financial management, accounting operations, and administrative support. Due to lean staffing and staffing turnover, Mr. Zahui's responsibilities came to also included procurement, information technology, and human resources. During the relevant time period of this case, ADF typically had two staff members with responsibilities regarding non-grant procurement activities: Mr. Zahui and an administrative staff member who served as a procurement specialist. With such limited internal staffing, ADF's procurement efforts were supported by the U.S. Department of Treasury's Bureau of Fiscal Service ("BFS").

Since 1999, the USAID OIG has been mandated to supervise, direct, and control audit and investigative activities relating to ADF programs and operations. During Mr. Zahui's tenure, the OIG completed fourteen independent financial audits and six purchase card risk assessments resulting in no major nonconformities.[4] Mr. Zahui also handled the OIG's assessments of ADF's information systems and reviews conducted by the Government and Accountability Office ("GAO").

### 2.    ADF operations are disrupted by the COVID-19 shutdown.

ADF long-struggled with coordinating travel and events for its employees and partners in Africa. Many airlines, accommodations, and event spaces in Africa are not necessarily arranged

---

[4] Office of Inspector General, U.S. Agency for International Development, *OIG Oversight: U.S. African Development Foundation Overview*, https://oig.usaid.gov/UADF-English.

with the typical ease as within the United States, which created logistical challenges and roadblocks for ADF when coordinating agency-related work within certain areas of Africa. *See* PSR ¶ 14. In 2019, to alleviate the problem, ADF leadership decided to contract with two African companies (one for supporting events in English-speaking countries and the other in French-speaking countries) to coordinate travel, lodging, and other logistics for ADF events in Africa. *Id.* In the fall of 2019, Mr. Zahui reached out to a former U.S. veteran and former Department of Veterans Affairs colleague (CC-1), who had established businesses in Kenya, for suggestions of any contractors in that area who would be able to provide the services ADF was seeking. *Id.* ¶ 14. Ultimately Company-1, in which CC-1 was involved, applied for the contract and was awarded a sole-source contract to provide logistical support for events in English-speaking African countries. *Id.* ¶¶ 15-16.

Mr. Zahui's technical training is in finance and budgeting, not federal procurement. *Id.* ¶¶ 81-83. Prior to being assigned the role of Contracting Officer Representative in December 2020, Mr. Zahui had received no formal training on ADF's procurement procedure. *Id.* ¶ 11. Thus, he relied heavily on his counterparts at BFS for guidance on how to award both sole-source contracts. As the government mentions in its brief, the contract award to Company-1 exceeded ADF's $100,000 cap on the value of sole-source contracts. *See* Gov't Memo at 3. However, Company-1's contract was not awarded in a vacuum or instantaneously. Rather, BFS conducted the review and notice requirements for a sole-source contract and executed Company-1's contract on March 5, 2020. *See* PSR ¶ 15.[5]

---

[5] In fact, the Contracting Officer who signed the award to Company 1 is a BFS employee—not Mr. Zahui or someone within ADF. *See* PSR ¶ 15.

23

The government's narrative of events implies that Mr. Zahui and ADF sought to contract with Company-1, as a ruse, after it was apparent the travel would be suspended in 2020 due to the COVID-19 outbreak. *See* Gov't Memo at 4. That narrative is contrary to indisputable facts:

- In late 2019, ADF sought to hire two African-based companies to provide logistical support for ADF events in Africa. *See* Statement of Offense ¶ 6.

- Even for a sole-source contract, there must be a statement of work; performance work statement; justification and approval document; mandatory public notice of 10 to 15 days; and negotiation of terms and price before the contract is awarded. *See* 48 CFR § 5706.302-70; 48 CFR § 6.302-2.

- The contract to support events in the French-speaking African countries was awarded in late February 2020.

- The contract to Company-1, to support events in English-speaking African countries, was signed by BFS on March 5, 2020. *See* Statement of Offense ¶ 7; PSR ¶ 15.

- International travel ceased, on a country-by-country basis, in mid to late March 2020 in an effort to curtail the spread of COVID-19.[6]

None of the contracts with Company-1, including those in later years, were sham contracts. Tellingly, the government does not take issue with every invoice submitted and paid through the contract with Company 1. *See* Gov't Memo at 11.

The government highlights a particular payment for Company 2, a staffing company, that was routed for payment through Company-1. *See* Gov't Memo at 5. This Company-2 invoice and

---

[6] *See e.g.* Al Jazeera, Coronavirus: Travel restrictions, border shutdowns by country (June 3, 2020), *available at* https://www.aljazeera.com/news/2020/6/3/coronavirus-travel-restrictions-border-shutdowns-by-country.

24

the manner of its payment was a faulty solution to a problem of ADF's internal controls and procedures. Mr. Zahui has admitted that more than 20 invoices were pass-through invoices to Company-1's contracts, *see* Statement of Offense ¶ 9, but contests the government's characterization that these invoices were an organized and planned scheme to funnel money to CC-1 via mark-ups.

It is certainly true that shortly after the contract award to Company-1, COVID-19 spread, and the world shut down, particular to international travel. As a result, the two logistics support contracts sat idle. As travel restrictions remained ever changing and in flux over the next couple of years, ADF continued to execute the contracts for logistical support for ADF events in Africa so that the funds would be available when circumstances allowed for events to resume. *See* PSR ¶ 16. In March 2020 and the months thereafter, IT support was of paramount importance for continued operations across industry and the government. Without this outside support, ADF's IT staffing consisted of a single person. ADF had been utilizing a  temporary funding source for additional IT staffing support. Due to an issue with the solicitation process, ADF ended up with a significant outstanding invoice for work already completed but no specific contract vehicle in place from which to pay for such work. *See* PSR ¶ 18. By July and August 2020, Mr. Zahui was under great pressure from Company-2 to pay the outstanding balances or otherwise face a stoppage of work.

With no good options to handle the situation, Mr. Zahui surmised two paths to resolution: (1) undergo the federal ratification process[7] for Company-2's invoice as an unauthorized commitment or (2) pay the invoice as logistical support through Company-1's existing and dormant contract. The first option would likely require months to accomplish and could involve

---

[7] Ratification is specifically disfavored in the Federal Acquisition Regulations. *See* FAR 1-602-3(b)(1).

interest penalties for late payment.[8] Thus, Mr. Zahui undertook the second option. While at the time, it was the seemingly "easier" path, Mr. Zahui recognizes that this choice was in error and the ramifications have been grave.

Nonetheless, Mr. Zahui's intention and focus was to not risk losing critical IT. He decided, wrongly to pay amounts owed to Company-2 through Company-1's contract. In his mind, influenced by his military background and past treatment of "logistics" as a broad and nearly all-encompassing concept, he rationalized his actions at the time because if the IT support services furthered ADF's mission in Africa, which they did, then the logistics contract originally meant for events in Africa could be used to pay for Company-2's services. Mr. Zahui followed this line of reasoning to pay the Company-2 invoice, and he repeated it in similar situations over the next few years when ADF was in a timing crunch without a specific procurement mechanism in place to pay parties who were providing services in support ADF's activities and mission. While this handling was wrongful, it was a stop gap for continuation of work.

### 3.    Mr. Zahui rationalizes his conduct based on his upbringing and family needs.

It is important for the Court to consider the context surrounding the money transfers that Mr. Zahui received from CC-1, which totaled $12,000 across eight payments, and how Mr. Zahui's personal history, cultural upbringing, and prior relationship with CC-1 impacted Mr. Zahui's thinking such that he would accept money from an ADF contractor. Mr. Zahui's use of the funds is also relevant: he did not spend the money on extravagant purchases for himself. Instead, he spent it on his children and household.

---

[8] The BFS website sets forth that the Prompt Payment Act requires federal agencies to pay their bills on a timely basis or be subject to interest penalties. *See* BFS, Prompt Payment, available at https://fiscal.treasury.gov/payments-from-government/prompt-payment.

Here, Mr. Zahui did not set out with nefarious intentions. In his mind, Company-1 was going to be able to provide the services for which it contracted. And later, when Mr. Zahui accepted money from CC-1, he compartmentalized the fact that CC-1, while a friend, was also a contractor for ADF. Given CC-1's dual status in Mr. Zahui's life, it was Mr. Zahui's duty and responsibility as a federal employee to recognize the ethical conflict and take necessary measures to uphold his duties as an executive in a federal agency. He fully accepts responsibility for not doing so.

Mr. Zahui was born and raised in a culture where communal living was essential for survival. Resources were shared communally, not just within a family. When Mr. Zahui's family had nothing to eat, their neighbors offered what little extra they could spare, and when Mr. Zahui's neighbors were lacking, Mr. Zahui's family did the same. Mr. Zahui continues to live by these communal values, as witnessed by the profession he entered, the organizations he volunteers with, the extended family he financially supports, and the home he opens up to those in need.

Mr. Zahui's relationship with CC-1 is no exception. Both Mr. Zahui and CC-1 immigrated to the U.S. from Africa, joined the military, worked at the VA, and lived in the DMV. While their relationship was not necessarily close, Mr. Zahui felt an affinity with CC-1 because of their shared experience and cultural values.

Prior to CC-1's involvement with ADF, Mr. Zahui and CC-1 helped each other in times of need. Mr. Zahui briefly lived with CC-1 when Mr. Zahui moved from San Diego to the DC to work for ADF. Mr. Zahui lent CC-1 his van and an extra set of hands when CC-1 needed help moving. Scrutinized under an American cultural lens, this kind of care is typically reserved for close family, not casual friends. But Mr. Zahui and CC-1 did not help each other because they were best friends or had a quid pro quo arrangement—they did it because it was their cultural

27

norm. So, when Mr. Zahui had expenses for the frequent travel and costly equipment required by his children's sports teams, it was culturally acceptable for him to accept CC-1's help.

Mr. Zahui's elder brother, who is most familiar with Mr. Zahui's upbringing, highlights how Mr. Zahui's childhood may have shaped his thinking and behavior at the time:

> [Mathieu's] early years were particularly difficult due to health challenges that limited his ability to participate in normal childhood activities. This isolation shaped him in profound ways…I know my brother to be a fundamentally honest, compassionate, and devoted family man. He has always taken his responsibilities seriously and has been deeply committed to those who depend on him. At the same time, I recognize that his desire to maintain relationships, perhaps rooted in the isolation he experienced growing up, may have contributed to poor judgment in this situation. In my view, this was not the result of greed or disregard for the law, but rather a failure to properly separate personal relationships from professional responsibilities.

Exhibit 6.

To be clear, Mr. Zahui's conduct was wrong. He should have known better than to accept money from a friend who was also an ADF contractor and to misstate and downplay the circumstances of his wrongful conduct during interviews with OIG agents. But Mr. Zahui is no criminal mastermind. Mr. Zahui is merely a person who, influenced by childhood pain and a communal upbringing, allowed his desire to belong and provide to make an error in judgment.

### C. The § 3553(a) Factors Support a Significant Variance and a Sentence of Home Confinement.

Under the U.S. Sentencing Guidelines calculation set forth in the PSR, the recommended sentence for Mr. Zahui is 15-21 months (total offense level 14). While the 21-month term of imprisonment sought by the government is within the prescribed range under the Guidelines, multiple factors here weigh in favor of a downward variance to a period of home confinement.

The Supreme Court has made clear that sentencing courts should not presume that the applicable Guidelines range is reasonable. *See Nelson v. United States*, 555 U.S. 350, 352 (2009) (citations omitted). Rather, the court must "account for factors unique to the defendant, such as the

28

nature and circumstances of the offense and the defendant's history and characteristics." *United States v. Gomez*, 955 F.3d 1250, 1256-57 (11th Cir. 2020). The reasonableness of a sentence is not determined by the amount from "which a sentence deviates from the applicable Guidelines range" but instead "by the district court's individualized application of the statutory sentencing factors." *See United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010); *see also Gardellini*, 545 F.3d 1089. "Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (internal quotation marks omitted).

**1.    A term of imprisonment is not warranted based upon Mr. Zahui's life, character, and participation in the instant offense.**

Mr. Zahui's childhood suffering, longtime military and civil service, and extraordinary acts of charity all support a downward variance to a sentence of home confinement. Federal courts regularly vary downward from the Guidelines because of these and similar factors.

The D.C. Circuit, as well as other federal courts, have held that a difficult childhood can be a mitigating factor at sentencing. *See United States v. Thomas*, 114 F.3d 228, 268-69 (D.C. Cir. 1997) (affirming consideration of negative influence in childhood as mitigating factor); *United States v. Moreno*, 583 F. Supp. 3d 739, 741 (W.D. Va. 2019) (affirming downward variance from 135-168 months to 36 months, in part, because of defendant's adverse childhood circumstances). Mr. Zahui's childhood was characterized by poverty, chronic illness, isolation, and loss—all of which had a lasting impact on Mr. Zahui. These experiences contributed to the offense conduct by shaping Mr. Zahui's motivations and influencing his decision-making process. As such, Mr. Zahui's difficult childhood should be considered a mitigating factor when assessing his culpability.

In addition, courts in this district have varied downward from the Guidelines in recognition of a defendant's military service and community support. *See United States v. Nassif*, 97 F.4th

29

968, 973 (D.C. Cir. 2024) (noting the sentencing court varied downward from the guideline range of 10-16 months to 7 months "in recognition of [the defendant's] military service and the expressions of community support for him"); *United States v. Foy*, No. 21-CR-00108 (TSC), 2024 WL 3471247, at *1 (D.D.C. July 19, 2024) (noting the sentencing court varied downward from the guideline range of 78-97 months to 40 months because of the defendant's history and characteristics, including military service). Mr. Zahui's decorated eight-year military career and over twenty-year career in civil service support a downward variance because they are evidence of Mr. Zahui's dedication to protecting and helping others. In addition, as evidenced by the character letters submitted with this sentencing memorandum, Mr. Zahui has tremendous support from his family, friends, and community members. *See generally*, Exhibits 1 through 15.

Also, multiple courts recognize that charitable deeds can serve as a basis for a downward variance. *See United States v. Rouhani*, 598 F. App'x 626 (11th Cir. 2015) (downward variance granted where district court found many people depended on defendant both in his business and personal life, and defendant had a history of trying to be a good citizen and doing good deeds); *United States v. Tomko*, 562 F.3d 558, 563 (3d Cir. 2009) (affirming downward variance from Guideline range of 12-18 months to sentence of probation based on the defendants "negligible criminal history, his record of employment, his support for and ties in the community, and the extensive charitable work he has done"). As reflected in this sentencing memorandum and the character letters submitted in support thereof, Mr. Zahui has dedicated his life to the service of other people, both in the United States and Africa. His extraordinary acts of charity over the past twenty-plus years reflect his strong moral character and the aberrant nature of his conduct in this case, and as such, support a downward variance.

**2.    A sentence of home detention reflects the seriousness of Mr. Zahui's offense, promotes respect for the law, and acheives the punishment and deterence goals of sentencing.**

A sentence of home confinement adequately accounts for the seriousness of Mr. Zahui's offense, promotes respect for the law, and provides just punishment for his conduct when factoring in his personal history and characteristics, acceptance of responsibility, low risk of recidivism, and the consequences he has suffered as a result of his pleading guilty in this case.

**(a)    Mr. Zahui has no criminal history, has accepted responsibility, and poses no risk of re-offense.**

Culpability is not the only consideration at sentencing; a principal goal of penal sanctions is rehabilitation. *See, e.g., Graham v. Florida*, 560 U.S. 48, 50 (2010). Mr. Zahui accepted both moral and legal responsibility for his conduct, agreeing to plead guilty shortly after he learned of the government's investigation and without the need for the government to bring charges by indictment. *See* PSR ¶¶ 42-43. Mr. Zahui has admitted he violated the law and let his own personal and family needs overcome his responsibilities as a civil servant. His regret for and personal disappointment in his actions are recounted in this memorandum and the letters submitted in aid of sentencing, and in the statement that Mr. Zahui will make to the Court at sentencing. There is nothing in Mr. Zahui's background or his behavior since the commencement of this case that suggests he poses any risk of reoffending. *See* § 3553(a)(2)(C). Indeed, he has learned his lesson and recognizes that accepting money from CC-1 and being dishonest about it was wrong.

**(b)    Mr. Zahui and his family have suffered substantially due to the criminal investigation and his pleading guilty.**

Mr. Zahui has already been punished and suffered substantially due to the criminal investigation into his conduct and his pleading guilty in this case. *See Gardellini*, 545 F.3d at 1095 (upholding probationary sentence, in part, because the defendant "already suffered substantially due to the criminal investigation into his wrong actions"). In February 2026, Mr. Zahui resigned

31

from his position at ADF and abruptly ended a twenty-year career in civil service, in which he invested in deeply. *See* PSR ¶ 90. The internet is rife with stories about this case, with many parties using this case as political fodder in support of efforts to defund and eliminate ADF altogether.[9] Once this case resolves, Mr. Zahui will be a 60-year-old unemployed felon with no possibility of working in the public sector and severely limited prospects in the private sector. Mr. Zahui has also lost the goodwill he gained from years of government service, and the respect and trust he has built with family, friends, and colleagues over the course of his life. These are serious consequences that last much longer than any sentence of confinement.

Mr. Zahui's wife and children will also suffer as a result of his pleading guilty in this case. With Mr. Zahui unemployed currently, the family will not earn enough from Mrs. Zahui's salary to pay their monthly expenses. *See* PSR ¶ 94. Not only will Mr. Zahui's conviction put a strain on the family financially, it will likely force the twins to quit their sports teams, and will have a profound impact on their future. Indeed, medical research indicates that children of incarcerated parents face formidable cognitive and health-related challenges throughout their development, including a "heightened risk of suffering "depression, PTSD, anxiety, asthma, migraines, and fair/poor health."[10] Mr. Zahui and his family have suffered, and will continue to suffer, as a result of his pleading guilty in this case.

---

[9] *See*, *e.g.* Luke Rosiak, *Corrupt Foreign Aid Agency Lives On After 11 Republicans Vote Against Defunding,* Daily Wire (Feb. 2, 2026), https://www.dailywire.com/news/corrupt-foreign-aid-agency-lives-on-after-11-republicans-vote-against-defunding.

[10] *See* Rosalyn D. Lee, et al, *The Impact of Parental Incarceration on the Physical and Mental Health of Young Adults,* PEDIATRICS: The Official Journal of American Academy of Pediatrics, Vol. 131, No. 4, pgs. 1188–1195 (Apr. 2013) ("Positive, significant associations were found between parental incarceration and 8 of 16 health problems (depression, posttraumatic stress disorder, anxiety, cholesterol, asthma, migraines, HIV/AIDS, and fair/poor health) in adjusted logistic regression models. Those who reported paternal incarceration had increased odds of 8 mental and physical health problems, whereas those who reported maternal incarceration had increased odds of depression.")

**(c)      A sentence of home detention achieves the punishment and deterrence goals of sentencing.**

Imprisonment for 15-21 months is not necessary to promote either the punishment or deterrence goals of sentencing. *See* § 3553(a)(2)(B). Scientific literature establishes that certainty of punishment, not a long custodial sentence, is what deters people from committing crimes, in the context of both defendant-specific and more general public deterrence. *See, e.g.*, Daniel Nagin and Greg Pogarsky, *Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of General Deterrence: Theory and Evidence*, 39 Criminology 4 (2001) ("[P]unishment certainty is far more consistently found to deter crime than punishment severity, and the extralegal consequences of crime seem at least as great a deterrent as the legal consequences"); Andrew von Hirsch, *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) ("[C]orrelations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance").

**3.      A sentence of probation with alternatives is consistent with prior gratuity sentences.**

Pursuant to 18 U.S.C. § 3553(a)(6), the Court is required to take into account "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Federal courts across the country are in accord, routinely issuing below-Guidelines sentences to defendants convicted of conduct similar to Mr. Zahui's. A review of sentences for defendants who were likewise convicted of gratuity offenses confirm that a below-Guidelines sentence for Mr. Zahui is appropriate. Indeed, data compiled by the U.S. Sentencing Commission reveals that between 2020 to 2025, approximately 60% of defendants sentenced under U.S.S.G. § 2C1.2 did not receive a term of imprisonment:

33

**Sentence Type by Type of Crime**
Fiscal Year 2020,2021,2022,2023,2024,2025

| Crime | N | % | Fine Only | | Prison Only | | Prison and Alternatives | | Probation Only | | Probation and Alternatives | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | N | % | N | % | N | % | N | % | N | % |
| Grand Total | 58 | 100.0% | 1 | 1.7% | 19 | 32.8% | 4 | 6.9% | 21 | 36.2% | 13 | 22.4% |
| Bribery/Corruption | 58 | 100.0% | 1 | 1.7% | 19 | 32.8% | 4 | 6.9% | 21 | 36.2% | 13 | 22.4% |

Export

The table includes the 58 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this table. Alternatives include all cases in which individuals received conditions of confinement as described in USSG §5C1.1.
**FILTER:**
Fiscal Year: 2020,2021,2022,2023,2024,2025; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: All; Guideline: §2C1.2; Drug Type: All; §2B1.1 Offense Type: All; Sentencing Zone: All; Criminal History: All; Career Offender Status: All

Multiple courts have sentenced defendants in gratuity offenses involving similar or more egregious facts to terms of probation with a period of home confinement. In *United States v. Farhat*, 5:20-cr-00246 (C.D. Cal. 2021), the district court imposed a below-Guidelines sentence of three years of probation with eight months of home detention to a public official whose conduct was objectively more egregious than Mr. Zahui's. *See id.* at ECF No. 43 (Judgment). Farhat worked at the Department of Defense as a construction manager and received $37,000 in illegal gratuities, more than triple what Mr. Zahui received. *See id.* at ECF No. 35 at 3. Farhat pleaded guilty to receipt of illegal gratuities and illegal compensation as a public official, which netted a total offense level of 14, which is the same as for Mr. Zahui. The district court in *Farhat* varied downward significantly. *Id.* at ECF No. 43.

Even in a gratuities case with a higher total offense, a sentence of probation with home confinement has been imposed. *See United States v. Kremer*, 2:18-cr-00163 (E.D. Va. 2019) at ECF No. 21 and ECF No. 24 (NASA Chief of the Range and Mission Management Office sentenced to 3 years of probation with twelve months of home confinement, after pleading guilty to violating 18 U.S.C. § 201(c)(1)(B), and 18 U.S.C. § 641 (theft of government funds), where

34

Guidelines range was 27 to 33 months incarceration and crime involved $19,469.00 in illegal payments).

Accordingly, a sentence of home confinement for Mr. Zahui is just, as it would align with the above defendants who were convicted for similar crimes.[11]

### 4. A downward variance permits a sentence without a term of imprisonment

In addition, proposed amendments to the Guidelines support a mitigated sentence in cases like this where the defendant has never before been convicted of criminal charges. As the Court is likely aware, the Sentencing Commission has recently adopted and submitted to Congress several amendments to the Guidelines that are scheduled to become effective on November 1, 2026, including the following introductory commentary to Chapter 5 which encourages courts to consider all relevant factors and "**all available sentencing options**" when fashioning a sentence:

> By statute, sentencing courts must consider and balance a broad range of factors when determining the appropriate sentence to impose in each individual case. Among these factors, courts are required to consider 'all available sentencing options.' 18 U.S.C. § 3553(a)(3). Each of the available sentencing options—imprisonment, probation, and fines—serves a punitive function, and the sentencing court must determine the option, or combination of options, that best achieves a sentence 'sufficient, but not greater than necessary to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)].' 18 U.S.C. § 3553(a).

---

[11] If, contrary to Mr. Zahui's position, the Court determines that a period of imprisonment is necessary in this case, a sentence at the low end of the Guidelines range, *i.e.* 15 months, would be still be an outlier, unjustified by the facts of this case. For instance, several courts, including this one, have imposed terms of imprisonment of less than a year when the sentencing range was the same as here. *See United States v. Richards,* 1:22-cr-10033 (D. Mass. 2022) (granting downward variance from 15-21 months to 4 months for one count of accepting gratuities and two counts of making a false statement); *United States v. Uzcatequi*, 1:12-cr-00232 (D.D.C. 2012) (granting downward variance from 15-21 months to 9 months for one count of accepting gratuities).

*See* Sentencing Guidelines for United States Courts, 91 Fed. Reg. 24,088 (May 4, 2026). A second amendment related to sentencing options was proposed but not ultimately submitted to Congress. Under that proposal, for a first-time offender like Mr. Zahui, an offense level of 14 would have been recategorized from the lowest offense level within Zone D to falling squarely within the middle of Zone B, which "authorizes a probation term to be substituted for imprisonment, contingent upon the probation term including conditions of confinement sufficient to satisfy the minimum term specified in the guideline range"; a split sentence; or a term of imprisonment. *See* U.S. Sentencing Commission, Proposed Amendments to the Sentencing Guidelines at 2, 12 (Jan. 30, 2026). Even though this proposal did not move forward this year, it acknowledges that a different form of punishment than imprisonment is likely warranted for first-time offenders who have a Criminal History Category of I.

The PSR notes multiple bases for a variance in this case. *See* PSR ¶ 132. Additionally, as set forth above, Mr. Zahui's challenging childhood, charitable deeds and community organizing, and health conditions provide further grounds for a variance. A downward variance from an offense level of 14 essentially correlates to a lower zone that authorizes probation with conditions or a split sentence.

Mr. Zahui's personal characteristics, the nature and circumstances of the offense, and the remaining § 3553(a) factors all support a sentence without imprisonment. As such, we ask the Court to exercise its discretion to vary downward from the Guidelines and order a punishment that "fit[s] [Mr. Zahui] and not merely the crime." *Pepper*, 562 U.S. at 487-88.

### D.    The Government Does Not Seek Restitution in This Case.

While the parties noted a disagreement as to the applicability of restitution under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, in the plea agreement, the government has abandoned the pursuit of restitution in this case and confirmed its position change

to defense counsel on May 15, shortly after submitting its sentencing memorandum with no section addressing restitution.[12] *See* Gov't Memo.

The government bears the burden of proving the amount of any victim's actual loss. 18 U.S.C. § 3664(e). Despite the final PSR contemplating an order of restitution, the PSR's stated restitution amount of $134,886.34 is based purely upon the plea agreement, and "[a]dditional information pertaining to restitution was not received from the Government." PSR ¶ 23. Notably, the amount in the plea agreement was a calculation at the time of the plea, and that preliminary statement of a calculation is insufficient to meet the government's burden of proving actual loss to a cognizable victim under the MVRA. Because the government has not met that burden, restitution cannot be ordered against Mr. Zahui under either sections 3663 or 3663A of Title 18.

If the Court determines that further inquiry regarding restitution is necessary, Mr. Zahui requests an opportunity to supplement this filing to outline why the loss amount stated in the plea agreement is beyond the scope of loss cognizable under the MVRA based upon the offenses of conviction.

### E.   Forfeiture Should Be Limited to the Amount Mr. Zahui Personally Obtained as a Result of the Offense Charged.

Pursuant to Federal Rule of Criminal Procedure 32.2, Mr. Zahui respectfully requests that the Court enter an order of forfeiture not to exceed $12,000, which represents the amount of proceeds he personally received from CC-1 as a gratuity. *See* PSR ¶¶ 35-36.

Under 18 U.S.C. § 981(a)(1)(c), the Court may order a person convicted of a gratuity offense "to forfeit property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting "specified unlawful activity." However, forfeiture is

---

[12] It is unclear if the government notified Probation of its decision not to argue for restitution because the final PSR simply notes that defense counsel did so. *See* PSR ¶ 23. (And defense counsel notified Probation via email, with the prosecutor copied.)

"limited to property the defendant himself actually acquired as the result of the crime," *Honeycutt v. United States*, 581 U.S. 443, 454 (2017), and, therefore, a defendant "cannot be ordered to forfeit profits that he never received or possessed." *United States v. Contorinis*, 692 F.3d 136, 145 (2d Cir. 2012); *see United States v. Cano-Flores*, 796 F.3d 83, 91 (D.C. Cir. 2015) (reading the criminal forfeiture statute "as providing for forfeiture only of amounts 'obtained' by the defendant on whom the forfeiture is imposed"). Mr. Zahui received $12,000 in money transfers from CC-1; therefore, the amount of proceeds he personally obtained as a result of the gratuity offense is $12,000.

## F.    A Sentence Without a Fine Is Appropriate in This Case.

A fine should not be imposed due to Mr. Zahui's inability to pay. Fines are not appropriate "where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." *See* U.S.S.G. § 5E1.2(c)(3). In determining whether to impose a fine and the amount of such fine, the Court shall consider, among other factors, "any evidence as to the defendant's ability to pay the fine, the burden that the fine places on the defendant and his dependents relative to alternative punishments, any restitution that the defendant has made or is obligated to make, the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed, and any other pertinent equitable considerations." *See* U.S.S.G. § 5E1.2(d)(7) and 18 U.S.C. § 3572(a)(6).

Mr. Zahui will soon be 60-years-old. He is the father of two young children and one child in college, all of whom financially depend on Mr. Zahui and his wife. Mr. Zahui has been unemployed since February 2026, when he resigned from his position at ADF. Mr. Zahui's employment prospects will be severely limited after this case is resolved. He has worked as a civil servant for the past twenty-five years, and apart from teaching community college, has no experience working in the private sector. After his sentence is complete, he will be five years away

38

from typical retirement age with a felony conviction, questionable possibility of working in the public sector, and limited opportunity to work in the private sector. Mr. Zahui's wife works full time, but even with her salary, the family's monthly expenses exceed their monthly income significantly. *See* PSR ¶ 94.

Mr. Zahui's unemployment, grim employment prospects, and diminishing finances support the position that a fine is not appropriate in this case. The PSR also supports not imposing a fine. *See* PSR ¶ 101. For these reasons, we respectfully request that the Court not issue a fine in this case.

## III.    CONCLUSION

Mr. Zahui has spent his life in the service of this country and to the less fortunate in Africa. He fought through poverty, disease, and heartache on his journey from a small farming village in the Ivory Coast to the capital of the United States of America. He arrived at many crossroads along his path, and at each crossroad, Mr. Zahui chose a life of service over a life of plenty—serving in the military, teaching at community colleges, working at Veterans Affairs and the African Development Foundation, and volunteering in his neighborhood, at church, at work, and with numerous organizations dedicated to protecting and providing for people who need it most.

Mr. Zahui made serious errors with regard to ADF contracting with Company-1 and his responses to OIG agents. But those mistakes do not overshadow a lifetime of service. Nor should a lifetime of service be ignored when it matters most. For these and the other reasons set forth herein, we respectfully request that the Court make a finding for a variance, impose a sentence of probation with one year home-confinement, decline to order restitution, and order no fine.

39

Dated: May 20, 2026

/s/ Karen D. Williams
Karen D. Williams, Esq. (Bar No. 10002902)
Joseph Simpson, Esq. (Bar No. 1615652)
COZEN O'CONNOR
2001 M Street NW, Suite 500
Washington, DC 20036
T: (202) 304-1452
T: (202) 747-0796
F: (202) 540-9682
F: (202) 499-2945
kwilliams@cozen.com
josephsimpson@cozen.com

*Counsel for Defendant*

## **CERTIFICATE OF SERVICE**

I certify that on May 20, 2026, the foregoing notice was electronically filed with the Clerk

of the Court using the Electronic Filing System, which will serve a copy on all counsel of record.


　　　　　　　　　　　　　　　　　　*/s/ Karen D. Williams*
　　　　　　　　　　　　　　　　　　Karen D. Williams

41